OPINION
{¶ 1} Defendant-appellant, Scott E. Payne, was indicted by the Franklin County Grand Jury on numerous counts of aggravated robbery, robbery, and kidnapping, all with firearm specifications, having a weapon under disability, and assault in two separate cases. The cases involved three robberies. The first robbery occurred at Village Petals Flower Shop; the second robbery occurred at Gracie's Flower Market; and the third robbery occurred at the State Employee's Credit Union ("SECU"). Prior to trial, appellant filed several motions, including motions to suppress evidence, identification, statements, and fingerprint evidence. A hearing was held prior to the trial and, at the conclusion, the trial court ruled that certain statements made by the co-defendant, Rodney Williams, would not come in as evidence. The trial court overruled the remaining motions. Following a trial before a jury, defendant was found not guilty of assault, but guilty on all the remaining charges. The trial court sentenced defendant to ten years as to each robbery of Village Petals, Gracie's Flower Market, Ed Maleszewski and SECU, with an additional three years for the firearm specification as to each robbery. The court ordered that the sentences be served consecutively with each other. The total sentence amounted to 52 years.
 {¶ 2} Appellant has appealed the trial court's judgment entry and assigns the following eleven assignments of error:
 1. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT OVERRULED DEFENDANT-APPELLANT'S MOTION TO SEVER THE TRIAL OF VILLAGE PETALS, GRACIE'S FLOWERS AND THE STATE EMPLOYEES CREDIT UNION, AND THE FAILURE TO DO SO DENIED DEFENDANT-APPELLANT A FAIR TRIAL, VIOLATING HIS RIGHTS UNDER THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 2. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT OVERRULED DEFENDANT-APPELLANT'S MOTION TO SEVER HIS TRIAL FROM CO-DEFENDANT, RONALD WILLIAMS.
 3. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN OVERRULING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS THE SUGGESTIVE IDENTIFICATION OF WITNESSES IN THE VILLAGE PETALS ROBBERY AND GRACIE'S FLOWERS, IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 4. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT OVERRULED DEFENDANT-APPELLANT'S MOTION TO SUPPRESS THE SEARCH OF A BLACK BAG TRANSPORTED TO GUERNSEY COUNTY BY DEFENDANT-APPELLANT, IN VIOLATION OF THE 4TH, 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION AND RULES OF CRIMINAL PROCEDURE.
 5. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN THE COURT FAILED TO SUSTAIN THE RULE 29 MOTION MADE AT THE END OF THE STATE'S CASE AND THE END OF THE CASE, THEREBY DENYING DEFENDANT-APPELLANT A FAIR TRIAL GUARANTEED BY THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 6. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN OVERRULING DEFENDANT-APPELLANT'S OBJECTION TO FINGERPRINT EVIDENCE, STATE'S EXPERT'S TESTIMONY AS TO THE MATCH OF DEFENDANT-APPELLANT'S PRINTS WITH THOSE LIFTED FROM GRACIE'S FLOWERS, NO SCIENTIFIC EVIDENCE OR BASIS HAVING BEEN OFFERED OR ACCEPTED IN THIS COURT OR BY ANY SCIENTIFIC BODY WHO VALIDATED SUCH PROCEDURE, RESULTING IN A DENIAL OF A FAIR TRIAL GUARANTEED BY THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 7. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ADMITTING EVIDENCE OVER DEFENDANT-APPELLANT'S OBJECTION, INCLUDING TESTIMONY AND EXHIBITS, THEREBY DENYING DEFENDANT-APPELLANT A FAIR TRIAL GUARANTEED BY THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 8. THE STATE WAS GUILTY OF PROSECUTORIAL MISCONDUCT IN MISSTATING AND CITING EVIDENCE NOT IN THE RECORD, SUCH CONDUCT CONSTITUTING PLAIN ERROR AND DENYING DEFENDANT-APPELLANT A FAIR TRIAL GUARANTEED BY THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 9. THE CONVICTION OF SCOTT PAYNE RELATING TO THE STATE EMPLOYEES CREDIT UNION AND ED MALESZEWSKI WERE NOT SUPPORTED BY THE EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THEREBY VIOLATING DEFENDANT-APPELLANT'S RIGHTS UNDER THE 5TH AND 14TH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 10. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN IMPOSING MAXIMUM SENTENCES, RUNNING SENTENCES CONSECUTIVELY, FAILING TO MERGE COUNTS AND IN FAILING TO MAKE NECESSARY FINDINGS AS WELL AS IMPOSING A SENTENCE CONTRARY TO PRINCIPLES AND THE PURPOSE OF THE SENTENCING ACT.
 11. THE TRIAL COURT ERRED AND COMMITTED PLAIN ERROR WHEN IT FAILED TO GIVE THE COMPLETE CHARGE AS TO EYEWITNESS IDENTIFICATION CONTAINED IN OHIO JURY INSTRUCTIONS, SECTION 405.20(5) AND THE CAUTIONARY INSTRUCTION AS TO UNRELIABILITY OF EYEWITNESS IDENTIFICATION REQUIRED BY UNITED STATES V. TELFAIRE, 469 F.2d 552, 558 (1972).
 {¶ 3} On April 25, 2001, Village Petals, a flower shop located at 573 South Grant Street, Columbus, Ohio, was robbed by two black men at approximately 3:30 p.m. The first man, later identified as defendant, pulled out a gun and told Chris Fryman, the manager, that it was a robbery. Although Fryman knew that a second man entered the store, defendant was the only person he saw. Defendant pushed Fryman close to the register and ordered him to get down on the floor. Betty Athey, who was also working at the flower shop that day, came out of the back area. Another person entered the store whom Fryman could not see. Because the person entering the store made no reaction to defendant holding the gun, Fryman assumed that the two men must be together. Defendant ordered Fryman to open the register and began asking where the safe was located. Fryman told defendant that there was no safe; however, defendant kept asking. Fryman hit the no-sale key on the register, the drawer opened and defendant began taking money out of the drawer.
 {¶ 4} Athey entered the room and the second person pushed her down on the floor next to Fryman. The second person went into the back room and began looking for the safe. After he found the safe, the second person told defendant to bring Fryman into the back room and have him open the safe. Before defendant took Fryman into the back room, he demanded Fryman's wallet. Fryman opened his wallet and gave defendant his money. Defendant continued to demand the wallet and Fryman's ID while he kept the gun pointed at the back of Fryman's head. In the back room, Fryman opened the safe and the men took things out of the safe, including the petty cash box. Defendant also demanded that Athey remove her engagement and wedding ring, which she did.
 {¶ 5} Soon after, the men left. Fryman ran to the door to see if he could see where they were going. Fryman saw two men running down the street towards Livingston Avenue and saw them jump into a van, which was facing the wrong direction. Fryman testified that the van was a Ford Aerostar, possibly white in color. Fryman later identified defendant as the man who had held a gun to his face, pushed him to the ground, and taken cash out of the cash register. A fingerprint from defendant was found on the cash register as well.
 {¶ 6} Robert Behrens, was driving home from work on Grant Street, heading south when he noticed a white minivan parked the wrong way on the east side of the street. Behrens testified that he noticed two men running up the sidewalk on the west side of the street and saw them enter the white minivan. Behrens turned his own car around and, as he did so, he noticed a man sticking his head out of the door of Village Petals and he thought that something must be going wrong. The van turned around and was headed north on Grant. Behrens pulled up behind the van, memorized the license plate number, and provided that number to Fryman and to the police.
 {¶ 7} On May 11, 2001, Gracie's Flower Market, located at 573 High Street, was robbed by two black men. Mindy Bates, the owner of the flower shop, was working that day when two black men entered the store and asked her questions about delivering flowers for Mothers' Day. One of the men, later identified by Bates as Ronald Williams, asked her about jewelry available at the store. The other man, later identified by Bates as defendant, lifted up his shirt and showed Bates a handgun. Defendant ordered Bates to give him the money. Defendant grabbed Bates' arm and pushed her towards the cash register so that she could open it. Bates gave defendant money from the cash register, but he still wanted more. Bates gave him $20 in change from a file drawer. Williams stayed on the other side of the counter while defendant emptied the cash register. According to Bates' testimony, defendant kept the gun pointed at her back while he was removing the money. The men continued to ask Bates for more money; however, she explained to them that she had gone to the bank that day and that there was no more money in the store. Bates' mother was in the back room where the two men could not see her during the robbery. She managed to place a telephone call. Defendant ordered Bates to get on the floor behind the counter, all the while keeping the gun pointed at her neck while she was moving. Bates heard the indicator on the door, which sounds when someone enters or exits and then saw only one set of feet. Bates heard the door indicator a second time and knew that both men were gone.
 {¶ 8} Eric Bush was walking home from work down South High Street when he noticed a van sitting at the stop sign at the corner of Blenkner and High Streets. Bush then saw two men exit the flower shop and quickly get into the van. The van drove north on High Street. Bush said that the van was a Ford Aerostar, off-white in color, and that the two men were black. Bush wrote down the license plate number because he thought the situation was odd. Bush left a message at the flower shop with the license plate number and also gave the license number to detectives who called him later.
 {¶ 9} The license plate from both robberies is registered to an address on Champion Avenue and the police began watching that address looking for the white van. On May 11, 2001, within hours of the robbery at Gracie's Flower Market, an officer noticed a van near Champion and Livingston Avenues. The occupants of the van were ordered out at gunpoint because the police were treating it as a felony traffic stop. Two adult women and several children were in the van and the police realized that these were not the people who had committed the two robberies. Marilyn Williams, Williams' sister, was driving the van. Another occupant informed Officer Kaufman that a family member and a friend had driven the van earlier that day and were at a house at 693 Bedford Avenue. Officers Kaufman and Boespflug proceeded to the address on Bedford Avenue. Defendant and Williams were found at that address and were arrested. Officer Wright contacted Mindy Bates and told her that the police had someone they wanted her to look at. Officer Wright brought Bates to the place where defendant was and she identified him as the man who had robbed at gunpoint. Bates also identified Williams. Both defendant and Williams were arrested; however, they were released ten days later.
 {¶ 10} On May 29, 2001, the SECU, located at 20 East Long Street, was robbed by two black males. The men ordered the employees and customers down on the floor and told them that this was a robbery. One man jumped behind the teller line and went through the manager's office door. The other man had a sawed-off shotgun which he pointed at the heads of the tellers. The men took money out of the teller drawers. One of the teller drawers was locked and the men tried to get one of the tellers to unlock it, but that teller did not have a key. The manager gave the men a key but it became stuck and one of the tellers offered to help. Ed Maleszewski was entering the building as the robbery was taking place. Maleszewski backed out the door, stepped around the corner, and used his cellular phone to dial 911. As he was calling, the men came out of the building, one man ran around the corner and told Maleszewski to give him the camera. Maleszewski did not have a camera and the man grabbed his arm. The other man came around the corner with a gun. Maleszewski gave the men what he had and saw them leave in a white older model LTD automobile.
 {¶ 11} Later that same day, Trooper Bernard of the Ohio State Highway Patrol reported to the scene of a traffic accident at Exit 186 off Interstate 70 in Guernsey County. Appellant had been driving the car when the brakes apparently failed and the car crashed. Williams had a cut on his leg and appellant was not injured. Williams was in possession of a black duffel bag which he kept near him while they were questioned by the patrol. Defendant was ultimately arrested for driving without a valid driver's license and Williams was about to be transported by emergency medical personnel for treatment. Officer Bernard testified that Williams had refused to tell him whose car they had been driving. He testified further that the men had seemed nervous and that he felt that something was wrong. Defendant told him that Williams' name was "Charlie Brown." During his testimony, Officer Bernard noted that defendant and Williams did not voluntarily offer any information, that Williams would not tell him whose car it was, that defendant said it was his brother's car, but would not give his brother's name, that the two men were acting nervous, and that, after defendant identified Williams as "Charlie Brown," Officer Bernard did not know who Williams really was. The black bag was within reach of Williams, and Williams was about to be transported to the hospital. Officer Bernard decided that, before Williams left the scene, the bag should be checked. Upon opening the bag, Officer Bernard moved a black sweatshirt out of the way and found large amounts of United States currency with bank wrappers around it and later found dye packs. It was later determined that the money and dye packs had come from SECU.
 {¶ 12} In his fourth assignment of error, defendant contends that the trial court erred and abused its discretion when it overruled defendant's motion to suppress the search of the black duffel bag, which had been in Williams' possession. This court will first address defendant's fourth assignment of error.
 {¶ 13} The trial court ruled that defendant did not have standing to challenge the motion to suppress regarding the black duffel bag Williams was carrying when the two men were involved in the accident in Guernsey County. It has long been recognized that Fourth Amendment rights are personal rights which may not be vicariously asserted. Rakas v. Illinois (1978), 439 U.S. 128. As such, a defendant's Fourth Amendment rights are only violated when the challenged conduct invaded his own legitimate expectation of privacy rather than that of a third party. United States v. Payner (1980), 447 U.S. 727.
 {¶ 14} Defendant does not challenge the trial court's determination that he did not have standing to challenge the motion to suppress regarding the black duffel bag. However, in light of the potential prejudice and the seriousness of the charges, we will address the issue as if defendant does have standing.
 {¶ 15} The propriety of Officers Bernard and Ralston's conduct in this case is dependent on whether it satisfied the principles announced in Terry v. Ohio (1968), 392 U.S. 1, and its progeny, authorizing and governing certain warrantless, investigatory stops under the United States Constitution. Under Terry and its progeny, a police officer, consistent with the Fourth Amendment's general prohibition against warrantless searches and seizures, may briefly stop and investigate an individual where the officer has reasonable, articulable suspicion that the individual has committed or is about to commit a crime. See Terry; United States v. Place (1983), 462 U.S. 696; Florida v. Royer (1983),460 U.S. 491; and United States v. Hensley (1985), 469 U.S. 221.
 {¶ 16} "Reasonable suspicion" is a term of art that is not " `readily, or even usefully, reduced to a neat set of legal rules.' " United States v. Sokolow (1989), 490 U.S. 1, quoting Illinois v. Gates (1983), 462 U.S. 213. The term connotes something less than probable cause, but something more than "inchoate and unparticularized suspicion or `hunch.' " Terry, at 27. Rather, in order to warrant a brief investigatory stop, "the police officer `must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " State v. Loza (1994), 71 Ohio St.3d 61, quoting from Terry.
 {¶ 17} The propriety of such a stop must be viewed in light of the totality of the surrounding circumstances. State v. Freeman (1980),64 Ohio St.2d 29, paragraph one of the syllabus. Moreover, a reviewing court must view the circumstances through the eyes of the reasonable and prudent police officer on the scene and must give due weight to the police officer's experience and training. State v. Andrews (1991),57 Ohio St.3d 86. In short, there must be some minimal level of objective justification for the stop. Terry concludes that it balances the suspect's liberty interest and the public safety interest by permitting a reasonable search for weapons where the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether the officer has probable cause to arrest the individual for a crime. Furthermore, the officer is not required to be absolutely certain that the person is armed. Instead, the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger. Id. at 27.
 {¶ 18} In overruling the motion to suppress regarding the black duffel bag, the trial court ruled as follows:
 What the court says is that the police can't conduct unreasonable searches, and I've looked at this. What I've got is an automobile accident, two State Highway Patrol Troopers show up. They've got two men that they say at least are acting in a suspicious fashion, are not forthcoming with their identities, are giving conflicting stores on a number of acts. One of whom is injured, is about to leave the scene with emergency medical personnel. And the police certainly at that point have a reasonable suspicion that something is going on that they maybe can't quite figure out. It certainly is beyond doubt that they would have at that point the right to detain both of these men. And there's, absent the fact that Mr. Payne is under arrest for driving under suspension, they could have detained both of them until they figured out what was going on. It would be reasonable to detain them.
 The fact that Mr. Williams is injured and he's about to leave not with law enforcement but with emergency medic personnel, certainly would give the trooper the right to pat him down and make sure that he's not armed. And in light of everything else that is going on, and suspicions that they have, the case law is clear that if you have the right to do a Terry pat down you have a right to do a search of the areas within the grasp, reach, of the detainee. It was pretty clear from the evidence that that bag was going to go into the emergency squad and be on its way to the hospital with Mr. Williams. And, therefore, I cannot say that it was unreasonable for the trooper to do a Terry-type search. Terry-type search is one where the exterior of the clothing is patted down, or the, in case of a person's purse or bag, that the exterior of the bag is patted down. You try to determine whether there are weapons involved because it's officer safety and civilian safety that's at issue.
 The Court has examined this bag. The only issue that remains in my mind is could the police have done a pat of the exterior of the bag and determined whether there was weapons in it and not go into the bag. From the description that was given to me in the evidence, that the bag was full of rolled money, I think that there's a black sweatshirt that was displayed to the Court that is a fairly bulky sweatshirt. In examining the texture of the bag I don't believe that the police could have done a thorough search for weapons without opening the bag. And on that basis I find that it's reasonable that they opened the bag. Once they opened the bag the money is visible in plain sight, wrapped in wrappers from a bank which would have been clearly, was at least potentially contraband or fruits of a robbery. So I find that the search and seizure is constitutional. I overrule the Motion to Suppress.
 {¶ 19} In reviewing the record, this court denotes that, although both Officers Ralston and Bernard indicated that they were not concerned for their own safety, the officers' testimony provided several articulable reasons for the search of the bag: (1) although both defendant and Williams answered the officers' questions, they were not always forthcoming with their answers; (2) defendant gave conflicting information regarding his social security number; (3) Williams would not say whose car they were driving; (4) defendant said it was his brother's car and gave the name, "William Brown"; (5) the car came back registered under the name "Meeko Williams"; (6) defendant said that they were coming from Zanesville and then changed the story and said that they were coming from Columbus; (7) defendant said that Williams' name was "Charlie Brown"; (8) Officer Bernard testified that, at that point in time, he was not certain who Williams really was; (9) defendant and Williams were acting nervous and Officer Bernard indicated that he thought that something was going on; (10) Williams kept the bag near him and took it to the ambulance with him (potentially putting the emergency personnel in danger); and (11) Officer Bernard testified that, with Williams about to leave the scene and in light of all of the above, he felt that he should search for weapons.
 {¶ 20} In light of the above testimony of the officers and the trial court's analysis, this court finds that the search of the black bag was permissible and that the contents of the bag were admissible in the trial against defendant and Williams. As such, defendant's fourth assignment of error is not well-taken and is overruled.
 {¶ 21} In his first assignment of error, defendant contends that the trial court erred in denying his motion to sever the cases. Crim.R. 8(A) permits the joinder of offenses "if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
 {¶ 22} The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character. State v. Lott (1990), 51 Ohio St.3d 160. An accused may move to sever the offenses under Crim.R. 14 upon the showing of prejudice. However, for an appellate court to reverse a trial court's ruling denying a motion for severance, the defendant must demonstrate that the trial court abused its discretion.
 {¶ 23} Under Crim.R. 14, the defendant has the burden of affirmatively showing that his rights were prejudiced. He must provide the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial. Id. at 163.
 {¶ 24} Defendant contends that he was prejudiced by the joinder of the offenses because of the fingerprint evidence which was found at the scene of the Village Petals robbery. Defendant contends that, once the jury knew that his fingerprint had been left at the scene at one of the robberies, the jury would automatically find him guilty of all the charges.
 {¶ 25} Trial courts are given considerable latitude in determining whether a severance is warranted and appellate courts review the decision for an abuse of discretion. State v. Wilkerson, Franklin App. No. 01AP-1127, 2002-Ohio-5416. In considering whether a trial court has abused its discretion, the test is whether a joint trial is so manifestly prejudicial that the trial judge is required to exercise his discretion in only one way — by severing the trial. The defendant must show clear, manifest and undue prejudice in a violation of a substantive right resulting from the failure to sever. United States v. Lane (1986),474 U.S. 438.
 {¶ 26} After reviewing defendant's argument and the evidence, this court concludes that defendant has not demonstrated that the trial court abused its discretion. The record indicates that defendant was identified by witnesses at both Village Petals and Gracie's Flower Market and that the picture taken from the security camera at the SECU depicts a man who bears a resemblance to defendant just moments before the robbery occurred. The offenses charged and tried in the present case were of the same or similar character as each aggravated robbery was committed with the use of a firearm. Further, the state had argued that the three aggravated robberies were part of a course of criminal conduct. Additionally, as noted previously, the contents of the black bag is admissible against both men. This court does not find that joinder of the offenses was so manifestly prejudicial that severing the offenses was required. Defendant's first assignment of error is not well-taken and is overruled.
 {¶ 27} In his second assignment of error, defendant contends that the trial court erred and abused its discretion where it overruled his motion to sever his trial from that of his co-defendant, Ronald Williams. Crim.R. 8(B) permits the joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count." The law favors the joinder of defendants and the avoidance of multiple trials because joinder conserves judicial and prosecutorial time, lessens the expenses of multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries. State v. Thomas (1980), 61 Ohio St.2d 223.
 {¶ 28} In order to obtain a severance, defendant needed to affirmatively demonstrate prejudice by the joinder. Crim.R. 14; Thomas, supra. In that regard, defendant was required to furnish the trial court with sufficient information so that the trial court could weigh the considerations, favoring joinder of Williams against those factors which preserve defendant's right to a fair trial. Wilkerson, at ¶ 33. As this court noted in Wilkerson, there is a risk that information introduced against one of the co-defendants may spill over against the other defendant in every trial where defendants are tried jointly. Furthermore, a trial court does not abuse its discretion in refusing to grant severance where the prejudicial aspects of joinder are too general and speculative.
 {¶ 29} In Bruton v. United States (1968), 391 U.S. 123, the United States Supreme Court held that a defendant is deprived of theSixth Amendment right of confrontation when a facially incriminating extra-judicial statement of a non-testifying co-defendant is introduced at their joint trial, despite a trial court's instruction to the jury to consider the statement only against the co-defendant. The Bruton rule applies even when the co-defendant's statement does not name the defendant specifically, but, when considered in context with all of the other evidence presented at the trial, the statement significantly contends to incriminate the defendant. State v. Moritz (1980), 63 Ohio St.2d 150.
 {¶ 30} In the present case, evidence was presented at the motion hearing that Williams had told one of the officers that the money in the bag came from an employer, and that he and defendant were taking the money to either Wheeling or Pittsburgh to deposit in defendant's sister's account. The trial court concluded that, if Williams was to testify, then Williams would not be permitted to state that the money was going to be put in defendant's sister's account. As such, the trial court did conclude that this potentially prejudicial statement would be kept out of evidence.
 {¶ 31} On appeal, defendant asserts that he was prejudiced by more than just the potential of Williams' statement coming into evidence. Defendant argues that Williams' prior conviction for robbery would come into evidence and that it would make his defense all the more difficult. Based upon the review of the record, defendant's argument herein and the trial court's determination to keep the statement out, this court finds defendant has not affirmatively demonstrated prejudice, nor has defendant shown that the trial court abused its discretion in overruling his motion for separate trials. As such, defendant's second assignment of error is not well-taken and is overruled.
 {¶ 32} In his third assignment of error, defendant contends that the trial court erred and abused its discretion in overruling his motion to suppress the identification of witnesses in the Village Petals and Gracie's Flower Market robberies. Defendant challenges the "show up" identification of him by Mindy Bates, as well as the photo arrays shown to Chris Fryman and Betty Athey.
 {¶ 33} Defendant contends that the trial court erred in overruling his motion to suppress identification, as the identification procedure was unnecessarily suggestive and denied defendant his due process of law. The Fifth and Fourteenth Amendments to the United States Constitution prohibit the admission of unreliable identification testimony derived from suggestive identification procedures; however, an impermissibly suggestive procedure alone does not require exclusion, but, rather, the identification process must be so unreliable under the circumstances as to create a substantial likelihood of irreparable misidentification before an identification will be excluded. See State v. Curry, Cuyahoga App. No. 80148, 2002-Ohio-2260.
 {¶ 34} In Neil v. Biggers (1972), 409 U.S. 188, the United States Supreme Court held that, even though a show-up procedure is suggestive, the identification may be reliable under the totality of the circumstances. In Neil, the court set forth the standards for the admissibility of testimony concerning an out-of-court identification by identifying the factors that should be considered in determining the likelihood of misidentification, as follows: the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. As such, identifications made subject to an otherwise impermissibly suggestive procedure are admissible where the identification itself is nevertheless deemed to be reliable. The central question is whether, under the totality of the circumstances, the identification is reliable even though the confrontation procedure was suggestive. State v. Garner (1995), 74 Ohio St.3d 49.
 {¶ 35} In the present case, Mindy Bates, the owner of Gracie's Flower Market, was given the opportunity to identify defendant after he was apprehended at the Bedford Avenue address. Bates had indicated that the robbers were in her store for a total of three or four minutes. She indicated that, during the time they were in the store, she was basically one-on-one with them and that the shop itself is very small. Bates spoke with them and answered their questions before defendant pulled the gun and announced the robbery. The trial court found that this was an extended period of time for her to view the robbers. The trial court also noted that Bates had been waiting on defendant and Williams as if they were customers and had obviously been paying attention to them. In her description of the robbers, she noted that one of them was shorter and stockier, while the other had more of a sculptured face. She also noted the scar on Williams' arm, their general clothing, and defendant's boots. At the show-up, Bates indicated that she was certain that they were the people who had robbed her. Lastly, the robbery itself took place around 4:00 p.m., and the show-up identification occurred between 6:00 and 7:00 p.m.
 {¶ 36} This court has also reviewed the testimony of Officer Wright who took Bates to the show-up. Based upon his testimony, and the testimony of Bates, it is clear that Bates had been informed that the police wanted her to look at one or more men to determine whether they were the men who had robbed her. The police in no way suggested to Bates that they had apprehended men who they believed may be the men who had robbed her.
 {¶ 37} Looking at the totality of the circumstances, this court concludes that the trial court did not err and abuse its discretion when it overruled his motion to suppress the show-up identification by Bates.
 {¶ 38} Defendant also challenges the photo arrays which were shown to Fryman and Athey. He contends that they were "obviously meaningless." Defendant contends that it was obvious that the pictures in the photo array were mug shots and that little was done to ensure an impartial identification. This court disagrees.
 {¶ 39} Both Fryman and Athey identified defendant when they were shown the photo array. Defendant appears to argue that, since it was apparent that the photos came from mug shots and since neither Fryman nor Athey could identify defendant in court, the photo array was obviously not impartial. The trial court had the opportunity to view the photo array and the photo array itself was not presented as evidence during the trial. This court finds that defendant has not demonstrated that the trial court erred and abused its discretion by permitting the testimony from both the police officer, as well as Fryman and Athey, that they had identified defendant from the photo array.
 {¶ 40} Defendant also challenges the identification testimony of Jacob Sahle. Sahle testified that the police approached him after the robbery at the SECU and asked him if he could identify anyone in the photo array. Sahle had noticed a white car that pulled into his lot to park. He informed the driver that it was a paid parking lot and the driver left. The police showed him a photo array and he identified a picture of defendant who he said seems like the man who had been driving the car.
 {¶ 41} Defendant does not challenge the photo array itself. However, defense counsel had the opportunity to cross-examine Sahle on his recollection of the events and the tentative nature of his identification to the photo arrays. This court concludes that defendant's argument goes to the weight of the evidence and does not demonstrate that the trial court erred and abused its discretion.
 {¶ 42} Defendant's third assignment of error is overruled.
 {¶ 43} In his fifth assignment of error, defendant contends that the trial court erred and abused its discretion when it overruled his Crim.R. 29 motion for acquittal made at the close of the state's case and again at the close of the evidence. Crim.R. 29(A) provides, in pertinent part:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. * * *
 {¶ 44} Pursuant to Crim.R. 29(A), a trial court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime had been proved beyond a reasonable doubt. State v. Bridgeman (1978), 55 Ohio St.2d 261, at paragraph one of the syllabus.
 {¶ 45} In overruling defendant's Crim.R. 29 motion as it relates to the robbery of the SECU, the trial court noted that the photo showing two individuals outside the credit union looking straight at the camera inside the bank was sufficient to find that reasonable minds could differ on the issue of whether or not that picture was of defendant and Williams. Furthermore, the court noted that the testimony indicating that defendant and Williams were in Guernsey County shortly after the robbery of the credit union was sufficient circumstantial evidence for reasonable minds to differ as to whether defendant and Williams had, in fact, committed the robbery. The same evidence trying defendant and Williams to the SECU robbery, also tied them to the robbery of Ed Maleszewski. Those robberies occurred within seconds of each other and the jury could reasonably conclude that the same men who committed the robbery at the SECU also robbed Maleszewski of his cellular phone.
 {¶ 46} Defendant seems to argue that the multiple charges relating to the robberies and the necessity of the trial court instructing the jury as to the different varieties of the robberies, as well as merger, was so prejudicial that the charges against defendant for the robbery of the SECU and Maleszewski denied him a fair trial. However, based upon a review of the record, this court finds that the trial court did not err in finding that there was sufficient evidence to submit the matter to the jury. Defendant has not met his burden to show that the trial court erred and abused its discretion. Defendant's fifth assignment of error is overruled.
 {¶ 47} In his sixth assignment of error, defendant contends that the trial court erred and abused its discretion in overruling his objection to fingerprint evidence. Defendant argues that the state's expert's testimony indicating that defendant's fingerprint matched the set of prints lifted from Gracie's Flower Market is inadmissible where no scientific evidence or basis has been offered or accepted validating such a procedure. As such, defendant contends that he was denied a fair trial.
 {¶ 48} Evid.R. 702 relates to testimony by experts and provides as follows:
A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons:
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
 {¶ 49} Defendant argues that there has never been a scientific study or test by reliable experts to establish the reliability of fingerprint evidence. Defendant asserts that the use of fingerprint evidence to conclusively identify a perpetrator results in a denial of due process guarantees.
 {¶ 50} In the present case, the trial court held a hearing prior to trial in which the state's fingerprint expert offered testimony regarding his practice and gave a general discussion of the history of fingerprint comparisons. Paul R. Bivens works for the Columbus Police Department in the Latent Print Unit. Bivens testified concerning the general process of latent print identification and noted that there are eight points of comparisons and verifications when dealing with latent fingerprints. Bivens indicated that studies indicate that everybody's fingerprints are unique. Bivens also stated that the error rate is essentially zero. Additionally, Bivens stated that, through peer review, errors can be minimized. Bivens then discussed his comparison of the print lifted from Gracie's Flower Market with the print he had for defendant, and how he made the comparison. The defense cross-examined Bivens but offered no evidence of its own.
 {¶ 51} The trial court has discretion concerning admissibility of expert testimony. An appellate court should not disturb the trial court's rulings on appeal absent a showing of an abuse of discretion. Frank v. Vulcan Materials Co. (1988), 55 Ohio App.3d 153. The trial judge is considered the gate keeper of evidence and must continue to have considerable discretion in deciding in a particular case how to go about determining whether particular expert testimony is reliable. Kumho Tire Co. v. Carmichael (1999), 526 U.S. 137 (interpreting Federal Evid.R. 702). In United States v. Havvard (2000), 117 F. Supp.2d 848, the defendant contended that opinion evidence on latent fingerprint identification does not meet the standards for reliability for admissible expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579; Kumho Tire Co., supra.
 {¶ 52} In Havvard, at 850, the court noted as follows:
 Daubert and Kumho Tire require district judges to act as "gatekeepers" of expert testimony, to ensure that proffered expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact. See Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167; Daubert, 509 U.S. at 589, 113 S.Ct. 2786. * * *
 {¶ 53} As the court noted, the issue is not relevance; instead, the issue is reliability. The court noted further that, in Daubert, the court identified several factors that may be relevant in evaluating the reliability of an expert's method for developing a relevant professional opinion. Those include the following:
 * * * [W]hether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether there is a high known or potential rate of error; whether there are standards controlling the technique's operations; and whether the theory or technique enjoys general acceptance within a relevant scientific or expert community. See Kumho Tire, 526 U.S. at 149-50, 119 S.Ct. 1167, citing Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786.
 {¶ 54} The court went on to note that, for decades, trial courts have permitted persons trained and experienced in latent fingerprint identification to testify about their opinions as to whether a given individual was a source of a latent fingerprint. The court noted further that the parties did not call to the court's attention any unreported cases rejecting fingerprint identification opinion testimony. In Havvard, the court discussed the testimony given by the fingerprint expert as to how latent fingerprints are taken, how they are compared and noted claims of uniqueness and permanence. The court concluded that the explanation made sense and that the court accepted it. As in the present case, all positive identification opinions are verified by a second qualified expert. The court concluded that, despite the absence of a single qualifiable standard for measuring the sufficiency of any latent fingerprint for purposes of identification, the court was satisfied that the latent fingerprint identification easily satisfied the standard of reliability in Daubert and Kumho Tire.
 {¶ 55} Upon review, this court adopts the well-reasoned opinion of the district court in Havvard and finds the trial court did not err and abuse its discretion in permitting the testimony. Defendant's sixth assignment of error is overruled.
 {¶ 56} In his seventh assignment of error, defendant contends that the trial court erred and abused its discretion in admitting certain evidence over defendant's objection. For the reasons that follow, this court overrules defendant's seventh assignment of error.
 {¶ 57} "Relevant evidence" is defined in Evid.R. 401, as follows:
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 {¶ 58} Pursuant to Evid.R. 402, all relevant evidence is admissible unless otherwise provided. Evid.R. 403, which pertains to the exclusion of relevant evidence on grounds of prejudice, confusion, or undue delay, provides as follows:
(A) Exclusion mandatory
 Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 (B) Exclusion discretionary
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.
 {¶ 59} Defendant contends that Maleszewski, Sahle, Fryman and Athey were permitted to speculate regarding their identification of defendant. Specifically, Maleszewski was permitted to say that the people numbered five and six on the photo array were closest to the people who robbed him. As noted previously, Sahle was permitted to testify that defendant looked to be the man who had driven the car into his lot. Fryman was able to identify defendant from the photo array but was unable to identify him in court. Athey was unable to identify anyone from the photo array, then indicated in court that Williams looked familiar to her.
 {¶ 60} First, with regard to Maleszewski, Sahle and Fryman, all three of those witnesses had been able to identify defendant in the photo array. In order for the evidence to be excluded under Evid.R. 403, defendant must show that the probative value is substantially outweighed by the danger of unfair prejudice. Defendant has not challenged the photo arrays put together by the police; instead, he challenges the witness' positive identification based upon the fact that none of them stated that they were absolutely certain that the men in the photo array were the men who robbed them. This court finds that the fact that they selected defendant's photograph from a photo array within a short time after the robberies were committed is relevant to the trial. The probative value of these eyewitnesses being able to select defendant from a photo array was highly relevant to the state's case.
 {¶ 61} With regard to the testimony of Athey, this court notes that her testimony indicating that Williams looked familiar to her was relevant. Athey was unable to identify defendant from the photo array or when she was in court, and defendant was not prejudiced by this testimony.
 {¶ 62} Defendant also challenges the testimony of Officers Kaufman and Boespflug regarding the statement made by one of the passengers in the van driven by Marilyn Williams. The officers had testified that, after the van had been pulled over, one of the occupants informed the police that Williams and a friend had driven this van earlier in the day and were currently at the address of 693 Bedford Avenue. Defendant contends that this testimony was hearsay and should not have been permitted.
 {¶ 63} Hearsay is defined in Evid.R. 801 as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Where an out-of-court statement is offered without reference to its truth, the statement is not hearsay. Furthermore, statements which are offered to explain a police officer's conduct while investigating the crime are not hearsay. See State v. Lewis (1970), 22 Ohio St.2d 125, and State v. Blevins (1987), 36 Ohio App.3d 147.
 {¶ 64} In the present case, the police had a description of a white Ford Aerostar van and a license plate number. After a check of records, the police learned that the van was registered to an address on Champion Avenue. The police then took steps to watch the address on Champion Avenue looking for the van. When the officers pulled the van over while Marilyn Williams was driving it, they ordered the occupants out of the van. It became apparent that neither defendant nor Williams were in the van. The police asked Marilyn Williams, as well as the other occupants of the van, if they had been driving the van earlier. One of the occupants informed the police that Williams and a friend had driven the van earlier in the day and that they could be found at the address on Bedford. The testimony concerning the statement made by the person in the van regarding who was driving the van earlier was offered to explain why the police ultimately decided to proceed to the Bedford address where defendant and Williams were ultimately apprehended. The statement was admissible.
 {¶ 65} Lastly, defendant challenges the fact that the prosecuting attorney was permitted to ask Williams whether he was armed with a knife during a 1993 robbery. Defendant contends that this evidence should have been excluded pursuant to Evid.R. 806(B).
 {¶ 66} Evid.R. 609 permits the use of a prior conviction to test credibility. Pursuant to Evid.R. 608(B), in the discretion of the trial court, and if probative of truthfulness or untruthfulness, specific instances of conduct may be inquired into on cross-examination of the witness concerning the witness' character for truthfulness or untruthfulness.
 {¶ 67} Williams voluntarily testified, three times, that he had been in prison and was currently on parole. Thereafter, defense counsel inquired as to whether Williams had been convicted of robbing a Kroger store in 1993. Williams answered in the affirmative. Thereafter, the following exchange took place:
 Q. [Defense counsel] And that was for robbery, not armed robbery, correct?
 A. [Williams] It was just robbery, yeah. Stealing out of the store. I was — I had — I was trying to run with the items I stole out of the store. They caught me robbing.
 {¶ 68} Later, on cross-examination, the following exchange occurred between the prosecutor and Williams:
 Q. [Prosecutor] And you made kind of a point of saying — what are you on parole for?
A. [Williams] Robbery.
Q. Robbery that happened in nineteen-ninety-three?
A. Yes.
 Q. And I think you made quite a point of saying but it wasn't a robbery that happened with a weapon, right?
A. I didn't say that. I said it was a robbery.
Q. It wasn't an armed robbery, through [sic], was it?
A. It wasn't no robbery like they're trying to claim that I did now.
Q. You used the weapon in that one, didn't you?
A. Weapon in where?
Q. In nineteen-ninety-three, in the Kroger store?
A. I didn't use no weapon.
Q. What was the knife for?
A. That was a box cutter. I had that for a work knife.
 {¶ 69} Counsel objected on the grounds that the conviction was actually for robbery and not armed robbery, even though Williams had used a box cutter in the robbery. The trial court noted that defense counsel had asked the question and that the prosecutor was entitled to ask questions on cross-examination. As such, the trial court did not err in permitting the testimony.
 {¶ 70} Defendant's seventh assignment of error is overruled.
 {¶ 71} In his eighth assignment of error, defendant contends that the state was guilty of prosecutorial misconduct when, during closing argument, the prosecutor indicated that it was Marilyn Williams, Williams' sister, who had told the police that Williams and his friend had been driving the van earlier and could be found at 693 Bedford.
 {¶ 72} The test for prosecutorial misconduct is whether the prosecution's conduct was improper and, if so, whether the conduct prejudicially affected substantial rights of the accused. Lott, at 165. " ' "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947. As such, misconduct is not grounds for reversal unless the defendant has been denied a fair trial. State v. Maurer (1984),15 Ohio St.3d 239, 266, certiorari denied (1985), 472 U.S. 1012.' " Wilkerson, at ¶ 38.
 {¶ 73} Defendant has failed to allege or otherwise demonstrate that, but for the statement made by the prosecutor during closing argument, defendant would not have been convicted. The statement that Williams and a friend of his had been driving the van earlier in the day and could be located at the Bedford Avenue address actually came from an occupant of Marilyn Williams' van and not from Marilyn Williams herself. The statement itself was admissible to explain why the police proceeded to the Bedford address. The misstatement during argument to which there was no objection appears to be of no consequence. Furthermore, the trial court instructed the jury that the evidence does not include the indictment, nor the opening statements, nor the closing arguments of counsel. Because defendant has not demonstrated that he was denied a fair trial, defendant's eighth assignment of error is overruled.
 {¶ 74} In his ninth assignment of error, defendant contends that his conviction of the robbery at the SECU and of Maleszewski are against the manifest weight of the evidence. The standard for determining whether a judgment in a criminal case is against the manifest weight of the evidence has been set forth by the Ohio Supreme Court in State v. DeHass (1967), 10 Ohio St.2d 230, paragraph two of the syllabus, which states:
 A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court.
 {¶ 75} The test for whether the judgment is against the manifest weight of the evidence is broader than the test for whether there is sufficient evidence to support a conviction. In considering the manifest weight of the evidence, the reviewing court weighs the evidence in a limited sense to determine whether there is sufficient, competent credible evidence to permit reasonable minds to find the defendant guilty beyond a reasonable doubt. An appellate court must ordinarily defer to a fact finder's resolution of factual and credibility issues. DeHass, supra.
 {¶ 76} Defendant notes that none of the tellers or customers inside the SECU were able to identify him. However, Maleszewski indicated that photos five and six were close in appearance to those who had robbed him. Photo five was of defendant. The camera outside the SECU took a picture of two men taken shortly before the robbery. According to the trial judge, the photo bore a reasonable resemblance to defendant and Williams. In a general sense, defendant and Williams matched the description of the men who had robbed the credit union, including the general description of the clothing which they were wearing. The automobile used in the SECU robbery was registered to Williams' brother, and Williams and defendant were in that car when it crashed in Guernsey County. Furthermore, defendant and Williams were found in possession of a large sum of money taken from the credit union, which also contained bank bands and dye packs. While it is correct that, in their testimony, both defendant and Williams maintained their innocence, this court finds that the judgment of conviction was not against the manifest weight of the evidence. Defendant's ninth assignment of error is overruled.
 {¶ 77} In his tenth assignment of error, defendant contends that the trial court erred and abused its discretion in imposing maximum sentences, running the sentences consecutively, failing to merge counts, and in failing to make necessary findings.
 {¶ 78} Defendant contends that the trial court erred in permitting convictions and entering sentence on the robbery counts involving Maleszewski, Fryman and Athey. Defendant contends that those robberies should have merged with the convictions for the SECU robbery and the Village Petals robbery, as the offenses were committed as one continuous act and were committed with a single animus.
 {¶ 79} R.C. 2941.25 provides as follows:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts of all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
 {¶ 80} The Ohio General Assembly permits cumulate punishment as long as the offenses in question do not constitute allied offenses of similar import. R.C. 2941.25(B); see, also, State v. Rance (1999),85 Ohio St.3d 632. When the statutorily defined elements of two crimes " `correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import.' " State v. Jones (1997), 78 Ohio St.3d 12, quoting State v. Blankenship (1988), 38 Ohio St.3d 116, 117. In engaging in this comparison, the court should examine the statutorily defined elements of the offenses in the abstract, not in the particular facts of the case before it. Rance, at 638. If the offenses constitute allied offenses of similar import, the defendant cannot be convicted of both unless the defendant committed the crimes separately or with a separate animus. Id. at 639, citing R.C. 2941.25(B), and Jones, at 14.
 {¶ 81} The five counts of aggravated robbery with which defendant was charged relating to this assigned error necessarily involved the same elements. Thus, this court must determine whether the offenses were committed separately or with a separate animus as to each within the meaning of R.C. 2941.25(B).
 {¶ 82} Where a defendant commits the same offense against different victims during the same course of conduct, a separate animus exists for each offense. State v. Byrd (1987), 32 Ohio St.3d 79. In Byrd, the court found that defendant's robbery of a store cash register and robbery of a store clerk's personal possessions constituted separate crimes having a separate animus. See, also, State v. Jones (June 13, 2000), Franklin App. No. 99AP-704.
 {¶ 83} In this case, each offense committed by defendant was perpetrated against a different victim and each victim was forced to relinquish their property to defendant. Although the SECU robbery and the robbery of Maleszewski occurred during one course of conduct, this court finds that each robbery was committed with a separate animus. Likewise, while the robbery of the Village Petals and Fryman and Athey occurred during one course of conduct, we likewise find that each robbery was committed with a separate animus. Accordingly, defendant was properly convicted and sentenced on each of these aggravated robberies in accordance with his conduct.
 {¶ 84} Defendant also contends that the sentences imposed by the trial court were disproportionate to the crimes for which defendant was convicted, is contrary to the purposes of sentencing, and that defendant was entitled to being sentenced to the minimum sentence possible.
 {¶ 85} R.C. 2929.11 provides two overriding purposes of felony sentencing: protecting the public from future crime of the offender and others, and punishing the offender. When sentencing a felony offender, a trial court must impose a sentence which is reasonably calculated to achieve these two overriding purposes. See State v. Dalton, Franklin App. Nos. 02AP-178 and 02AP-179, 2002-Ohio-5171.
 {¶ 86} The trial court has broad discretion when sentencing within the statutory guidelines. A reviewing court may not disturb a sentence imposed by a trial court unless it finds by clear and convincing evidence that the sentence is not supported by the record, or is contrary to law. Dalton, supra.
 {¶ 87} R.C. 2929.14(E)(4) provides that the court may impose consecutive sentences for conviction of multiple offenses if the court finds that consecutive sentences are necessary to protect the public from future crime or to punish the offender, that the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
 {¶ 88} When a trial court imposes consecutive sentences under R.C. 2929.14, it must also comply with R.C. 2929.19(B)(2)(c), which mandates that the court make a finding against its reasons for selecting the sentences imposed. R.C. 2929.12(A) confers upon the trial court discretion of how to effectively comply with the purposes and principles of sentencing set forth in R.C. 2929.11. R.C. 2929.12(A) further provides that, in the exercise of such discretion, courts must consider the applicable aggravating and mitigating factors in the statute.
 {¶ 89} In the present case, the trial court provided the following reasoning for imposing consecutive prison terms:
 The Court has done a couple of things here that need certain findings on the record. First of all I gave more than a minimum sentence to this Defendant. This was a series of aggravated robberies, armed, some of them committed while charges were pending on earlier cases, one of them committed after he had been arrested for an earlier one and he was out of bond, or if not on bond, he was out as a result of some sort of a snafu through the police department or the jail, it's beyond me why he was ever out at large to commit the latter robberies, but at any rate the Court finds based upon that and the totality of the circumstances involving the use of the weapon, multiple victims, that the shortest prison term would demean the seriousness of the offender's conduct and will not adequately protect the public from future crimes by this offender and by others.
 These sentences are consecutive, and what the Court finds here based upon the same things that I have outlined is that the consecutive sentence is necessary to protect the public from future crime and to punish this offender. They're not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.
 I find that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct, and although he hasn't a serious any kind of record, this behavior in and of itself is a record of sorts. This criminal conduct demonstrates that these consecutive sentences are necessary to protect the public from potential future behavior from him.
 {¶ 90} It appears that the trial court found that all three provisions of R.C. 2929.14(E)(4) apply to justify consecutive sentences. After defendant was arrested in connection with the robberies of Village Petals and Gracie's Flower Market, defendant was released from custody. The record is unclear whether defendant was released on bond or if, at that point and time, the police failed to charge him. In any event, there was insufficient proof that defendant was "awaiting trial or sentencing" for R.C. 2929.14(E)(4)(a) to apply. Even though the evidence does not support a finding of (a), there is evidence to support a finding under (c) and (b). In the finding under R.C. 2929.14(E)(4)(c), the court is justified in taking into account defendant's conduct in committing additional offenses while free from jail (for whatever reason) after the initial charges. Perhaps that is what the trial judge meant as he analyzed all of defendant's conduct to fully justify a finding under R.C. 2929.14(E)(4)(b) and (c).
 {¶ 91} Defendant's tenth assignment of error is overruled.
 {¶ 92} In his eleventh assignment of error, defendant argues that the trial court erred and committed plain error when it failed to give the charge as to eyewitness identification contained in Ohio Jury Instructions 405.20(5), as well as cautionary instructions which defendant contends are required by United States v. Telfaire (1972),469 F.2d 552.
 {¶ 93} In the present case, defendant did not request that the trial court give the jury instruction which he now contends was error for the court not to give. Furthermore, defendant did not object to the trial court's failure to give the instruction. Thus, the trial court's failure to give such an instruction is reviewed under the plain error standard.
 {¶ 94} Generally, the failure to object at trial is deemed a waiver of the alleged error on appeal. State v. Moreland (1990),50 Ohio St.3d 58. An exception to the general rule exists for plain errors affecting substantial rights. Crim.R. 52(B). Pursuant to State v. Long (1978), 53 Ohio St.2d 91, at paragraph three of the syllabus:
 Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.
 {¶ 95} In Long, the court held that, in order for a jury instruction which violated R.C. 2901.05(A) to constitute plain error, the court must find that, but for the error, the outcome of the trial clearly would have been otherwise.
 {¶ 96} Defendant cites Telfaire, where the Sixth Circuit Court proposed a model instruction on eyewitness identification. We reject defendant's contentions that this instruction is required under Ohio law. In Long, the court gave an erroneous instruction which did not conform with R.C. 2905.01(A). Nevertheless, the Ohio Supreme Court overruled the challenge on appeal and upheld the conviction. In the present case, the trial court did not give an erroneous jury instruction. On review, this court cannot say that, but for the inclusion of the additional charge that defendant requested, the outcome would have been different. Defendant's eleventh assignment of error is overruled.
 {¶ 97} Defendant's assignments of error are overruled, and the judgments of the trial court are affirmed.
 McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.